Filed 6/9/16  In re C.H. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re C.H. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>C.H.,<br><br>    Defendant and Appellant. | G052977<br><br>(Super. Ct. Nos. DP021038-003 & DP025419-001)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Andre Manssourian, Judge.  Affirmed.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, and Karen L. Christensen and Debbie Torrez, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

C.H. (Mother) appeals from the juvenile court's order made at the Welfare and Institutions Code section 366.26 hearing (all further statutory references are to the Welf. & Inst. Code) terminating her parental rights to four-year-old C.H. and 23-month-old M.R. and freeing them for adoption. Mother argues the court erred by not applying the parental benefit exception.[1] We disagree and affirm the order.

FACTS

*Detention*

In its detention report dated September 11, 2014, Orange County Social Services Agency (SSA), stated that two days earlier C.H. and M.R. were taken into protective custody and placed at Orangewood Children and Family Center (Orangewood) because Mother and M.R.'s father (Father)[2] repeatedly exposed the children to domestic violence. SSA said that despite a temporary restraining order (TRO) forbidding Father from having any contact with Mother, she became pregnant with his child and they communicated through calls and texts.

SSA filed a petition alleging C.H. and M.R. were children as described in section 300, subdivisions (b), failure to protect, and (j), abuse of sibling. With respect to section 300, subdivision (b), the petition stated the following: Mother and Father had an ongoing problem with domestic violence, some of which caused injuries to Mother and some of which occurred in the children's presence; from July 2013 to May 2014, law enforcement officers responded to Mother's home 14 times for reports of domestic violence or court order violations; in August 2014, Father physically assaulted Mother and when C.H. told Father to let Mother go, Father spanked C.H., which led to an

---

[1] Neither C.H.'s father nor M.R.'s father appeal from the juvenile court's order terminating their parental rights.

[2] C.H.'s father's whereabouts were unknown and the circumstances that gave rise to the petition did not involve him. Thus, we will refer to M.R.'s father, who is M.R. Sr., as Father for ease of reference and with the understanding he is not C.H.'s father.

emergency protective order (EPO) for the children; after the August 2014 incident, Mother failed to obtain a permanent restraining order and resisted participating in a domestic violence program; despite the TRO, Father's physical assaults, and Mother's belief Father was using methamphetamine, Mother called, texted, saw, lived with, and engaged in sexual relations with Father, resulting in her pregnancy; Mother allowed Father to have contact with the children knowing Father was violent and suspecting he was abusing methamphetamine; Mother had a history of substance abuse problems, including methamphetamine; at the time of C.H.'s birth, Mother tested positive for methamphetamine and marijuana, and C.H. tested positive for methamphetamine; Mother had a lengthy criminal history and had to register as a controlled substance offender; and Father had an unresolved substance abuse problem with methamphetamine and marijuana, and he had a lengthy criminal history.

With respect to section 300, subdivision (j), the petition stated the following: On April 26, 2011, C.H. was declared a dependent child when Mother tested positive for methamphetamine, amphetamine, and marijuana and C.H. tested positive for methamphetamine upon her birth; Mother used methamphetamine two days before C.H. was born; in May 2011, C.H. was placed in Mother's care under a family maintenance plan; a supplemental petition was sustained in April 2012 after Mother violated the family maintenance plan when she was arrested for shoplifting while C.H. was present; after Mother was admitted to the Prototypes program in April 2011, she had to restart the initial phase of the program because she violated the program's terms; in November 2011, Mother left C.H. unattended upstairs on the bed while she went outside to smoke; C.H. was again placed in Mother's care under a family maintenance plan; and the prior 2011 dependency proceedings were terminated in March 2013.

At the detention hearing on this petition, the juvenile court concluded a prima facie case had been made and ordered C.H. and M.R. detained (§§ 319, 300).

3

*Jurisdiction/Disposition*

SSA filed the jurisdiction/disposition report on October 9, 2014, and an addendum report two weeks later. In the jurisdiction/disposition report, social worker Laura Parsley recommended the juvenile court sustain the dependency petition and order reunification services for Mother and Father. The children were placed with foster parents.

Parsley reported C.H. and M.R. were taken into protective custody on September 9, 2014, because Mother and Father engaged in domestic violence. Mother and Father admitted to violating the TRO, which resulted in Father's arrest on a few occasions. Mother admitted to using methamphetamine and marijuana but claimed she had been sober since April 2011. Father disputed Mother's sobriety, stating she used marijuana as recently as August 2014 and she possessed methamphetamine. Father admitted to abusing methamphetamine and marijuana as recently as July 2014. Both Mother and Father had significant criminal histories.

Parsley explained Mother admitted Father assaulted her in the children's presence. Mother also admitted the EPO prohibited Father from having contact with the children but she did not obtain a TRO and the EPO expired. Mother denied Father, who was incarcerated, lived with her for a couple months. Mother offered a myriad of reasons why neither she nor C.H. were participating in services, including that she was pregnant. Mother had also failed to move or change the locks. Mother could not understand why her children were taken from her. She could not control Father's behavior, and she called the police when he violated the TRO. Mother also stated she was pregnant and Father was the only person to help her.

Parsley interviewed Mother on September 25, 2014. Mother stated she could not protect herself or her children because Father broke into her house. Mother called the police when Father assaulted her but not when she saw him outside the house or at the store. Mother did not renew her lease and she and the children would be moving

4

soon. As relevant here, Mother admitted the allegations in the petition. However, Mother stated Father spanked C.H. not because of domestic violence but instead because "[C.H.] only had underwear on." She also denied Father lived with her.

Twenty-seven-year old Mother stated she first used methamphetamine when she was 13 years old and marijuana when she was 14 years old. She admitted "using substances daily for [10] years" but claimed she had been sober since April 2011. She spent six months in jail but was not on probation or parole. Mother was willing to participate in any services to get her children back.

Parsley reported C.H. stated she would like to live with Mother. Parsley stated Mother had two hour visits three times per week. Mother was scheduled to have a interview/visit on September 16, 2014, but she did not attend and rescheduled for the following day. The next day, she arrived one hour late and had her two-hour interview but was unable to have her visit. A monitored visit two days later went well. C.H. was happy to see Mother, but she was upset when she left and wanted go home with Mother. Parsley recommended Mother participate in the Personal Empowerment Program (PEP), attend individual counseling and parenting class, and submit to randomized drug testing.

In the addendum report, Parsley reported Mother gave birth to a stillborn child and that she subsequently learned Mother admitted to police using methamphetamine two times during her pregnancy and that she relapsed after delivering her stillborn child. Mother tested positive for amphetamine at the time of the birth. Parsley advised Mother to begin the perinatal drug program and attend 12-step meetings. Mother was to begin drug testing on October 17, 2014.

The court held a combined jurisdiction/disposition hearing on October 28, 2014. Mother and Father submitted to the petition. The court found the allegations true, sustained the petition, and declared C.H. and M.R. dependent children. The court set a six-month review hearing for April 4, 2015.

*Six-Month Review*

SSA filed the six-month status review report on April 1, 2015, followed by three addendum reports. In the six-month status review report, social worker Susan Houn recommended continuing reunification services for Mother but terminating services for Father; the children were with the same foster parents.

Houn reported Mother lived with relatives outside the county, did not work, and received supplemental benefits. Mother was accepted to Heritage House, but she did not enter because she believed the area was in an area known for drug use. Mother stated that if she was able to reunify, she would like to enter a residential home for women and children.

Houn stated C.H. was reported to be "bossy, demanding, and directive." C.H. was diagnosed with "disruptive behavior disorder NOS, neglect of child, and posttraumatic stress disorder." C.H. requested Mother live with the foster parents or that she remain with the foster parents and Mother could visit. C.H. had been having nightmares about Mother and Father. M.R. was reported to be a happy child.

Houn reported Mother had made minimal progress with her case plan. Mother completed the following: two out of five counseling sessions; eight out of 10 PEP classes; and two out of nine parenting education classes. From October 2014 to March 2015, Mother drug tested negative 27 times. During that time, she missed two drug tests and one test was voided because the tamper seal was not intact. Mother attributed her difficulty completing services due to transportation problems. Mother had not participated in a substance abuse program but was scheduled to begin one March 31, 2015.

Houn explained that despite a TRO that expired in 2017, she suspected Mother and Father were in contact. On two occasions, Mother and Father drug tested at the same location, one time their samples were collected at the same time and the other

6

time 30 minutes apart. Mother denied seeing Father at the testing location but Father admitted seeing Mother.

Houn reported that in February 2015, the maternal grandmother called the children. When C.H. asked to speak with Mother, the maternal grandmother said Mother was not home. When that call ended, C.H. called Mother. Mother told C.H. she was at the maternal grandmother's house. C.H. was "very confused."

Houn stated Mother had six hours of supervised visits per week. Mother arrived 30 to 60 minutes late for visits and/or left early, and three hour visits were sometimes two hours. Mother cancelled five visits, including the Christmas visit. Mother cited transportation issues as the reason for her untimeliness. Mother made promises to the children, for example to buy lunch or toys, but did not follow through. Initially, Mother struggled to supervise both children simultaneously. Mother often lost sight of one child, and the foster parent had to intervene to supervise the other child. Houn advised Mother she had to be the primary caregiver, and she agreed. Over time Mother did a better job and the visits improved. Despite Mother's claim otherwise, Houn stated Mother did not call the children every day and when she did call it was late and the children were asleep. Houn said C.H. had a book with Mother's voice and one evening she had the book and cried for Mother. When C.H. telephoned Mother, Mother "did not say very much."

Houn reported Mother wanted to reunify with her children and needed help with and would like additional services. Houn said C.H. had anxiety over where she would live, wanting to live with both the foster parents and Mother.

In the first addendum report, dated five weeks after the six-month status review report, Houn changed her recommendation. Houn now recommended terminating reunification services for both children and scheduling a section 366.26 hearing. Houn explained a paternal aunt, Marina de la Cruz (Marina), and her wife, Vanessa de la Cruz (Vanessa), wanted to provide placement and adopt.

Houn reported Mother missed a random drug test on April 16, 2015, and a week later she had a drug patch applied. Houn explained Mother was terminated from her substance abuse program because she did not attend meetings or counseling sessions. However, Mother did complete her domestic violence program.

Houn reported the foster parents had concerns Mother was "oversharing" with C.H. Mother showed C.H. a picture of the stillborn baby. C.H. later had a nightmare about her dead brother. Mother also shared with C.H. the discomfort of her menstrual cycle. C.H. subsequently thought she would start bleeding. When Mother tried to discuss court proceedings with C.H., the foster parents redirected the conversation. Houn stated generally the visits went well, Mother was on time except once when she was 20 minutes late, Mother was able to supervise both children, and she brought snacks and sometimes activities.

Houn reported Mother made minimal progress with her case plan. Based on Mother's failure to attend substance abuse classes and counseling sessions despite her repeated assurances she would attend, Houn concluded there was insufficient evidence Mother would complete her services if given another six months.

In a second addendum report, Houn reported that in May 2015, law enforcement were called to Father's house three times because Mother was disturbing the peace. She was outside the residence yelling and she caused property damage, kicking a gate and breaking a window.

In a third addendum report, Houn reported Mother admitted she had not been attending counseling or outpatient programs and was late to her visit in May 2015. Mother was not compliant with her drug patch. Mother denied the incident at Father's house.

Houn reported that on April 8, 2015, Mother went to Father's residence and asked him to help her with something. Because of the TRO, Father left the area and called law enforcement. While Father spoke with an officer, Mother called Father at least

8

20 times and texted him 22 times. When the officer answered the cell phone and tried to speak with Mother, she would not answer.

Hound reported that on May 13, 2015, Father was arrested for possession of drug paraphernalia. Officers arrested him after seeing him and a female arguing on the side of the road and Father throw an object. The female drove away in a green car. Officers recovered a broken methamphetamine pipe. Father, who appeared to be under the influence of a stimulant, told officers he argued with his girlfriend over their remaining methamphetamine.

Houn concluded Mother was not addressing the allegations in the petition and she continued to violate the TRO. Houn stated that although officers did not identify the woman involved in the May 13, 2015, incident, Mother was known to drive a green car. Houn stated Mother was not participating in services, and although she completed the domestic violence program, she would need to complete the program again because she violated the TRO. Mother stated she was overwhelmed and had not followed through on her assurances to participate in services. Houn concluded four-year-old C.H. and one-year-old M.R. "are in need of permanency and stability." Houn said that because of their young age and their parents lack of progress in their case plans, violations of the TRO, and lack of insight, Houn opined it was in the children's best interests to terminate reunification services.

At the six-month status review hearing where Mother was not present, the court concluded there was a substantial danger to C.H. and M.R. if returned home and reasonable services had been provided to Mother. The court terminated reunification services for Mother and Father and scheduled a section 366.26 hearing for September 29, 2015.

*Section 366.26*

In the interim report filed on July 2, 2015, social worker Lupie Janos reported the children continued to live with the same foster parents but that Marina and

9

Vanessa had visits with the children. Janos stated Marina and Vanessa's home in Bakersfield had been approved.

SSA filed a section 366.26 report on September 18, 2015, and an addendum report six weeks later. In the section 366.26 report, Janos stated the children were adoptable and termination of parental rights was not detrimental, and she recommended referral for adoption placement. Janos reported the children were placed with Marina and Vanessa; C.H. wanted her and M.R. to live with them.

Janos reported M.R. had a smooth transition to his aunts' house. Janos said M.R. participated in activities with C.H., and C.H. "appear[ed] connected to [M.R.]" Janos stated C.H. "appear[ed] distressed over her long-term care[]" and after she visited with Mother, C.H. sought reassurance she would live with her aunts. C.H. told Janos "she wanted to live with her 'aunts', did not want to live with the [M]other, and wanted to still be able to visit [the foster parents]."

Janos reported that on July 9, 2015, when she tried to speak with C.H. about visits with Mother, C.H. crawled underneath her bed. C.H. stated she loved visits with her aunts and would like a "sleepover" but she wanted to live with Mother; C.H. told her therapist the same thing. When Janos told her that might not happen, she said she liked her foster parents and aunts. Janos reported that on August 10, 2015, she met with C.H. and asked her how she felt about moving in with her aunts. C.H. replied she was moving soon and wanted to live with her aunts. C.H. told Janos she did not want to talk about Mother. Janos met with Mother on August 20, 2015; she had a bruise on her left temple and a cut on the bridge of her nose. Mother told Janos that she suffered the injuries the previous night during a fight with Father.

Janos reported Mother was incarcerated from June 5, 2015, to June 12, 2015; Mother missed two visits during this time. One evening after Mother was released, the foster parent told C.H. she had to call Mother. C.H. responded, "'[W]ho's mommy, you're my mommy'." Three weeks later, there was a supervised visit at the park.

10

Mother fed the children and played with M.R.  However, "[t]here was minimal conversation between the [M]other and either child[,]" and C.H. ran to the foster parent and Janos.  Three weeks later, C.H. told the foster parent "she d[id] not want three mommies, and only want[ed] one bed."  Mother was admitted to Heritage House on August 6, 2015.

A few days later, Janos reported C.H. had been ending visits one hour early for about three weeks.  C.H. ignored Mother more and more and refused her telephone calls.  When C.H. did speak with her, she says, "'Mom.  I love you.  That's it.'"

At a visit on August 10, 2015, C.H. completely ignored Mother and interacted only with the foster parent and played on the playground.  Mother told the foster parent she did not want to participate in the treatment program and just wanted her children back.  Father called Mother three times during the visit and Mother answered the calls.  C.H. rolled her eyes at Mother and mimicked her.

Ten days later, there was a visit at a McDonalds restaurant where Mother fed the children.  When the foster parent began to change M.R.'s diaper, Mother offered to change his diaper.  C.H. did not speak to Mother during the time Janos was present.

The following week there was a visit at Heritage House where C.H. showed affection towards Mother and Mother gave her a doll.  Near the end of the visit, Mother needed to be reminded to change M.R.'s diaper.  When Mother asked C.H. whether she liked living at Heritage House, C.H. stated she wanted to live with her aunt.  When Mother suggested C.H. could live at Heritage House, C.H. was silent.

At a visit at Heritage House the following day, C.H. told Mother she loved her.  Mother wanted the children to watch television.  When the childcare coordinator refused, Mother said, "'I don't play with my children for [three] hours.'"  The coordinator suggested Mother use toys to play with the children, she said, "'I don't want to.'"  Mother also said, "'I'm going nut [*sic*] in here for [three] hours.'"  Mother told staff and Janos she could not do a three hour visit.

11

At a visit a few days later at the Heritage House, C.H. told Mother she loved her. Mother played with the children, read to them, and took them to lunch. Mother said it was difficult to play with two kids at the same time. Mother ended the visit 20 minutes early.

There was a visit the following day at the Heritage House. Mother played with the children and took them to lunch. During the visit M.R. challenged Mother's authority by throwing toys and coloring on the door. When Mother said the visit was over, C.H. said she did not want to leave. Mother replied, "'I know you don't want to but your brother get [*sic*] on my last nerve.'"

Janos reported Mother's drug patch testing referral had been terminated because she missed her appointment to have the patch changed. Janos stated that in May and June 2015, Mother was convicted of theft and drug offenses and she was the victim of domestic violence by Father in July and August 2015.

Janos requested the juvenile court appoint Marina and Vanessa de facto parent status. Janos opined the permanence and stability of the children far outweighed the detriment of terminating parental rights. Janos requested parental rights be terminated and the children be freed for adoption.

In the addendum report, Janos reported that as of late October 2015, the children appeared comfortable with Marina and Vanessa. Janos stated there was a visit on September 16, 2015, that Marina described as "good." However, Marina stated Mother did not participate in the entire six hour visit. Marina stated the following: "'[Mother] was taking a lot of cigarette breaks; [four to five] times during the visit, 10 minutes every time. She left the kids with [Marina and Vanessa].'" Janos stated that as of October 1, 2015, Mother could not leave the treatment facility for an offsite visit because she had not completed her homework. The children had one visit with Mother at the treatment facility about a week later. Janos reported that on October 14, 2015, Mother entered a new treatment program and could not leave the facility for 30 days.

12

On the day of the section 366.26 hearing, Mother filed a section 388 petition supported by her declaration. Mother requested the court return her children to her or alternatively to order additional reunification services.

At the hearing, the juvenile court denied Mother's section 388 petition. The court concluded Mother had not established changed circumstances or that the proposed change was in the children's best interests. With respect to the section 366.26 hearing, Mother's counsel argued the parental benefit exception applied. The court disagreed, finding none of section 366.26's statutory exceptions applied. The court terminated parental rights as to both C.H. and M.R.

## DISCUSSION

Mother contends the juvenile court erred by not applying the parental benefit exception to termination of parental rights. We find no error.

At a section 366.26 hearing, the juvenile court determines a permanent plan of care for a dependent child, which may include: (1) adoption (requiring termination of parental rights); (2) guardianship; or (3) long-term foster care. (§ 366.26, subd. (c)(1), (c)(4)(A).) "If the dependent child is adoptable, there is strong preference for adoption over alternative permanency plans." (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.)

To avoid termination of parental rights and adoption, a parent has the burden of showing one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) The exceptions permit the court, "in *exceptional circumstances*," "to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

The so-called parental benefit exception applies when there is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child due to . . . the following circumstances: [¶] The parents have maintained regular visitation and contact with the child and the child would benefit from

13

continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "The 'benefit' necessary to trigger this exception has been judicially construed to mean, 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citations.]" (*In re J.C.* (2014) 226 Cal.App.4th 503, 528-529 (*J.C.*); see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn*).)

"A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence. [Citation.] It is not enough to show that the parent and child have a friendly and loving relationship. [Citation.] '"Interaction between [a] natural parent and child will always confer some incidental benefit to the child . . . ."' [Citation.] For the exception to apply, 'a *parental* relationship is necessary[.]' [Citation.] '"While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." [Citation.]' [Citation.]" (*J.C., supra*, 226 Cal.App.4th at p. 529.)

We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child. (*J.C., supra*, 226 Cal.App.4th at pp. 530-531.) The latter determination "calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have

14

on the child and to weigh that against the benefit to the child of adoption . . . ." (*J.C., supra*, 226 Cal.App.4th at p. 531.)

*I. The First Prong-Visitation*

The regular visitation and contact element of the beneficial relationship exception "is somewhat self-explanatory." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2014) Permanency Planning Procedures, § 2.171[5] [b][ii][A], pp. 2-590 to 2-591.) It does not require the parent to have "'maintained day-to-day contact'" (*In re C.B.* (2010) 190 Cal.App.4th 102, 124), but it does require the parent to have "maintained *regular* visitation and contact" (§ 366.26, subd. (c)(1)(B)(i), italics added).

Here, neither Mother nor SSA devote much time to discussing visitation. Nevertheless, we conclude substantial evidence supports the court's implied finding Mother's visitation was not regular and consistent. During this year long dependency proceeding, Mother had six hours of monitored visits per week. There were times Mother visited consistently and for a time Mother's performance during visits improved to the point she was bringing food and activities to visits and supervising both children during the visit. But we cannot conclude the visits were regular.

From the beginning, Mother cancelled visits and arrived late and/or left early. During Fall 2014, Mother cancelled five visits, including a Christmas visit. Additionally, during Winter 2014 to 2015, Mother was regularly late to visits and/or left early from visits resulting in two-hour visits instead of the allotted three hours. Mother missed a couple visits while she was incarcerated in June 2015. Although the duration of Mother's visits improved while she was at Heritage House, Mother was late to a visit in June 2015, she was on her cell phone with Father three times during a visit in August 2015, and she repeatedly took smoke breaks during a visit in September 2015. Based on this evidence, the court could reasonably conclude Mother's visitation was not regular

15

and consistent and she was not making a priority the goal of maintaining stable relationships with her children.

## II. *The Second Prong-Weighing the Benefits*

"[A] successful parental benefit exception claim rests not on whether the parent-child contacts '"confer some incidental benefit to the child . . . ."' [Citation.]" (*J.C., supra*, 226 Cal.App.4th at p. 532.) Here, substantial evidence also supports the court's finding the benefit of adoption outweighed maintaining the parent-child relationship.

Mother relies on the following evidence, which she contends compels a finding the parental benefit exception applies. C.H. was emotional at the end of visits and Mother reassured her. C.H. was melancholy after listening to the book with Mother's voice. C.H. asked Mother to live with her and the foster parents. C.H. stated she wanted to live with Mother. C.H. expressed affection for Mother. C.H. did not want to leave a visit at Heritage House. Mother provided food and played with C.H. at visits.

It is true C.H. was upset at the end of a few visits but one of the visits was immediately after she was removed from Mother's care and the other visit C.H. was in the process of baking cookies and ultimately did not have any difficulty separating from Mother. As to the book incident, it occurred on January 6, 2015, near the beginning of these proceedings and not long after Mother cancelled her Christmas visit. In July 2015, C.H. did state she wanted to live with Mother but the following month, and thereafter, said she wanted to live with her aunts. C.H. did express affection for Mother, saying she loved her, but also stated, "'That's it.'" C.H. was clearly frustrated Mother could not consistently and timely attend visits and provide care for her and her brother.

Lastly, but most importantly, were the quality of the visits, i.e., whether and how Mother performed. Mother cites to the fact that at a number of visits she brought food and played with the children. A complete understanding of those visits, and others, paints a different picture. In the beginning, Mother was not able to supervise both

16

children and the foster parent had to intervene. On other occasions, it was the foster parent who would start to change a diaper before Mother would intervene. Additionally, Mother demonstrated questionable judgment by showing C.H. a photograph of the stillborn child and sharing with her the pain of her menstrual cycle.

Mother suggests she did as much as she could considering her visits were monitored. We disagree. Houn advised Mother early on she had to be the primary caregiver, and Mother agreed. Yet she did not assume a parental role.

As to the visits Mother cites to as demonstrating she cared for her children, her statements during those visits compel a contrary result. On August 28, 2015, Mother told the childcare coordinator, "'I don't play with my children for [three] hours." Mother later repeated to the children she could not "'do this for [three] hours.'" At another visit four days later Mother said it was difficult playing with two children. At another visit the following day, Mother told C.H. that M.R. got on her "'last nerve.'" Mother's inability, and apparent unwillingness, to supervise and play with her children for even a brief time compels the conclusion the parent-child relationship did not promote the children's best interests. Finally, Mother's continuous contact with Father, despite the TRO, did not promote the well-being of C.H. and M.R. Based on all the evidence, the court could reasonably conclude the parent-child relationship did not promote the children's best interests to such a degree as to outweigh the benefit of being placed in a permanent home with new, adoptive parents.

Mother relies on a number of cases to support her claim she demonstrated the benefit of the parent-child relationship outweighed children's well-being from being placed with Marina and Vanessa. But based on the above evidence Mother failed to overcome the high hurdle required to demonstrate there was a strong attachment between her and C.H. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1349-1350 [balancing flexible but parent must establish termination of parental rights detrimental to child];

17

*In re Casey D.* (1999) 70 Cal.App.4th 38, 51 [adoption ordered unless exceptional circumstances of strong and beneficial parent-child relationship]; *Autumn, supra,* 27 Cal.App.4th at p. 575 [adult's attention to child's needs demonstrating significant attachment].) Thus, we conclude the juvenile court did not abuse its discretion by not applying the parental benefit exception to termination of parental rights.

Finally, Mother states that if we agree the parental benefit exception applies, we should reverse the order terminating her parental rights to M.R. and remand the matter for the juvenile court to determine whether the sibling benefit exception applies. (§ 366.26, subd. (c)(1)(B)(v).) Below, the court found none of section 366.26, subdivision (c)(1)(B)'s exceptions applied. On appeal, Mother does not provide any argument explaining how the court erred by concluding the sibling benefit exception did not apply. Mother forfeited this claim. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 [contentions waived when there is failure to support them with reasoned argument and citations to authority].)

## DISPOSITION

The order is affirmed.

O'LEARY, P. J.

WE CONCUR:

MOORE, J.

FYBEL, J.

18